JUSTICE LEAPHART,
dissenting.
I concur in the Court’s opinion on issues 1, 3, and 4.1 dissent from the opinion on issue 2.
As heinous as this fact situation is, I am constrained to honor the dictates of the law as set forth in § 46-14-213(2), MCA, which states in part: “A psychiatrist or licensed clinical psychologist may not offer an opinion to the jury on the ultimate issue of whether the defendant did or did not have a particular state of mind that is an element of the offense charged.”
Santos was charged with deliberate homicide and felony theft. Both offenses require proof that he acted “knowingly” and “purposely.” The legislature has defined “purposely” as follows: “[a] person acts purposely with respect to a result ... if it is the person’s conscious object to engage in that conduct or to cause that result.” Section 45-2-101(58), MCA. It is thus clear that the Montana legislature has *140 specifically stated that a psychiatrist or psychologist may not offer an opinion as to whether a defendant, when committing an act, acted knowingly, purposely or had a conscious object to engage in the conduct in question. There is no question but that in this case the prosecution elicited precisely this type of testimony from Dr. Wise with regard to Santos’ striking of Walter Gebhardt with a hammer and using a rope to stop Thelma Gebhardt from breathing.
The Court quotes two of the questions posed by the prosecutor to Dr. Wise in which the prosecution very pointedly asked whether certain acts “would demonstrate a purpose of the defendant to carry out specific abilities” and whether those acts would “demonstrate a conscious objective on his part to engage in a particular form of conduct....” The Court then suggests that these questions related to Santos’ theft of the vehicle rather than the homicides. The Court then concludes that, although the questions violated § 46-14-213(2), MCA, they were, in light of the overwhelming evidence, harmless error. However, when the questions are put in their full context, it is apparent that they related not only to the theft of the vehicle, but also to the homicides. As can be seen from the following excerpt of the transcript, Dr. Wise was asked to recall some very specific factual statements that Santos had made to Agent Scott in a written statement.
Q Do you recall reading at the end of the statement, and if you have it available and need to refresh your recollection, please do so, but I would recall or direct your attention particularly to pages 33 and 34 of the transcript of the statement that was given by the defendant to Agent Scott.
A The one I have goes up to 18.
Q Well, you may have — is it single spaced, Doctor?
A Maybe you can direct me to that statement.
Q I guess I’m talking about it’s on the end, whether it’s on may [sic] page 33 or your page 17 or whatever, where he makes a statement to agent Scott to the effect that he decided to take a particular action, he decided — he thought about it, he took a particular action by deciding to get the hammer and by going into Walter Gebhardt’s room and hitting him in the head with it.
A Yes.
Q And do you recall reading that portion of the tape where he said that he took the rope from the pulley that was above Thelma Gebhardt’s bed and used it to keep her from breathing earlier?
*141 AI don’t remember the pulley, but I remember reading the rest of it.
Q Do you recall reading the part from that statement where he stated that he decided to take money from Mr. Gebhardt’s wallet?
AYes.
Q Do you recall reading from that statement the portions where he stated that after striking the Gebhardts in the head, he decided to bum stuff in the fireplace and he specifically decided to do that to get rid of evidence?
A Yeah. I don’t remember the words “specifically decided.” I do remember that he did that and he said that, told that in the interview.
Q Do you recall him explaining to deputy, or rather to Agent Scott that the reason he did that was to get rid of evidence?
AYes.
Q And do you recall him describing how he chose to take the car, to attempt to change the plates on it and to drive it out of town?
AYes.
Q So at that point in time, at least, the defendant was certainly aware of where he was; correct?
AYes.
Q He was aware of what he was doing; correct?
AI would assume that, yes.
Q And he was aware of who he was doing it to; correct?
A Are you talking about after the murder or before?
Q Well, I’m talking about his own statements to the agent about his conduct.
A Yeah, I would say just from those statements, I would refer that, yes.
Q At least by the defendant’s own words, those acts would certainly demonstrate a purpose of the defendant to carry out specific abilities, would they not?
AI would say that, yes.
Q And they at least demonstrate a conscious objective on his part to engage in a particular form of conduct, do they not?
AYes.
Q And that it was his purpose, by his own description, to cause a particular result; correct?
A Based on the interview, yes. [Emphasis added.]
*142 Before asking Dr. Wise whether Santos’ acts demonstrated a “purpose” and a “conscious objective on his part to engage in a particular form of conduct,” the State prefaced the questions with certain facts — including the fact that Santos said he decided to get a hammer, that he went into Walter Gebhardt’s room and hit him in the head with the hammer and that he took a rope and used it to keep Thelma Gebhardt from breathing. In addition to the questions already discussed, the State also inquired of Dr. Wise whether these acts indicated that Santos was “aware of what he was doing” and was “aware of who he was doing it to.” Obviously the prosecutor’s questions related to more than just the theft of the El Camino vehicle.
It is hard to imagine a more blatant violation of the statutory prohibition against having a psychologist express an opinion as to the defendant’s state of mind at the time he is alleged to have committed a homicide. Here, the State was allowed to elicit testimony from a psychologist to the effect that Santos acted purposely and had a conscious objective when he hit Walter with the hammer and used a rope to prevent Thelma from breathing.
The State obviously felt it necessary to present expert testimony on the question of the defendant’s state of mind. Although I agree that more general questions as to the defendant’s “capacity” to have a particular state of mind are legitimate, the questions posed here went well beyond general “capacity” type questions. They went directly to the ultimate question of whether the defendant had the requisite state of mind at the time the offenses were committed. In light of the bizarre and gruesome behavior of this defendant, I do not see how such an error can be considered harmless. The clear provisions of § 46-14-213(2), MCA, give me no choice but to dissent.